FILED
2026 OCT 26 AM 10: 35
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TN

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **CONNIE REGULI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 3:24-cv-00694** |
| | ) | |
| **JOSEPH A. WOODRUFF, et al.,** | ) | **Judge Trauger** |
| | ) | **Magistrate Judge Evans** |
| **Defendants.** | ) | **JURY DEMAND** |

**EXHIBIT 1.** *In re Jonathon S. C-B,* M2010-02536-COA-R3-JV, (Tenn. Ct. App. July 31, 2012)

# *In re Jonathan S. C-B*

Court of Appeals of Tennessee, At Nashville

November 16, 2011, Session; July 31, 2012, Filed

No. M2010-02536-COA-R3-JV

**Reporter**

2012 Tenn. App. LEXIS 924 *

IN THE MATTER OF: JONATHAN S. C-B

**Subsequent History: [*1]** Rehearing denied by *In re Jonathan S. C. B., 2012 Tenn. App. LEXIS 603 (Tenn. Ct. App., Aug. 20, 2012)*

Subsequent appeal at, Remanded by *In re Jonathan S. C-B, 2014 Tenn. App. LEXIS 40 (Tenn. Ct. App., Jan. 29, 2014)*

**Prior History:** *Tenn. R. App. P. 3* Appeal as of Right; Judgment of the Juvenile Court Affirmed. Appeal from the Juvenile Court for Davidson County. No. 2008001471. Betty K. Adams Green, Judge.

*In re Jonathan S. C. B., 2011 Tenn. LEXIS 317 (Tenn., Apr. 4, 2011)*

**Disposition:** Judgment of the Juvenile Court Affirmed.

**Counsel:** Connie Reguli, Brentwood, Tennessee, for the appellant, Ok Yung Chung.

Jacqueline Belle Dixon, Nashville, Tennessee, for the appellee, Stephen Paul Bruehl.

Jessica Hooper, Nashville, Tennessee, for minor child, Jonathan S. C-B.

**Judges:** PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

**Opinion by:** PATRICIA J. COTTRELL

## Opinion

The mother of a five year old boy alleged that the boy's father had sexually abused him, and she petitioned the juvenile court to have the father's visitation privileges revoked. After a long course of proceedings that included an investigation by the Department of Children's Services, testimony by a number of mental health professionals, and a report by the guardian ad litem, the court concluded that the Mother's allegations were unfounded, that her hostility against the father was having a detrimental effect on the child, and that it was in the child's best interest that the father be named as the child's primary residential parent in place of the mother. The mother raises numerous procedural issues on appeal, and she also contends that her allegations of abuse against the father were true, or at the very least that she had a good faith belief in their truth. Having carefully considered the mother's allegations and her arguments, we affirm the trial court.

**OPINION**

**I. A PARENTING ORDER**

The child at the center of this case, Jonathan S. C-B, was born on October 20, 2004. The child's father, Dr. Stephen Bruehl, and his mother, Dr. Ok Yung Chung, were living together at the time of his birth, but were unmarried. Both parents are medical professionals. Mother is an anesthesiologist and Father is a clinical psychologist. The parents

separated in March of 2008, and Mother filed a petition in the Juvenile Court of Davidson County to be named as the child's primary residential parent. Father filed an answer and counter-petition, asking the court to grant him joint or full custody of the child.

The initial custody proceedings were highly contentious. They included the filing of numerous motions, seven separate days of hearings over a course of four months, and a psychological evaluation of both parents. On October 6, 2009, the trial court filed an order that included detailed findings of fact. Among other things, the court noted that the relationship between the parents has been tumultuous from the beginning; that Jonathan suffers from asthma, but that the parents disagree as to its seriousness, cause and treatment; and that Father has a long history of substance abuse, but that he appears to have remained clean and sober since the episode that led to the parties' separation in March of 2008.

The court named Mother as the child's primary residential parent, with sole decision-making authority. The court also ordered that Father's parenting time be supervised, that he abstain from prescription drugs and alcohol, and that he continue to follow an aftercare program to maintain sobriety. The court declared that Father could petition the court for a modification of the visitation schedule, "[a]fter two years of sobriety and compliance with the aftercare plan." Father's brother was designated to supervise his parenting time. Father and his brother were ordered to meet with the child's asthma doctor for instruction on preventing and treating attacks.

Mother was ordered to inform Father of all the child's doctor visits, and she was "encouraged to select a psychologist to assist the child in establishing a positive and nurturing relationship with both parents." Both parents were warned not to make disparaging remarks about the other parent.

Father filed a motion to modify the court's order shortly thereafter. The trial court conducted a hearing on his motion and entered an order on November 25, 2009, permitting Father to have phone visitation with the child two evenings a week, enlarging the list of individuals authorized to supervise Father's visitation to include other family members, and setting out a detailed set of procedures for exchange of the child at the Belle Meade police station before and after each visitation. Later proceedings included testimony about the conduct of the parties during the exchanges at the police station, including one incident when the child refused to go for visitation with Father

## II. Allegations of Abuse

The court's orders did not improve the relationship between the parties. On January 25, 2010, Father filed a petition against Mother "for Criminal and/or Civil Contempt and Other Relief." The Petition included the claim that there had been a substantial and material change of circumstances since the court's October and November orders and a request that the court modify and increase Father's parenting time. Among other things, Father alleged that Mother had not allowed him to exercise telephone visitation, that she or someone authorized by her had made disparaging remarks about Father in the presence of the child, and that she had violated the spirit of the October order by failing to engage a child psychologist.[1]

Father also reported that he had been contacted by an investigator from the Department of Children's Services (DCS) about an anonymous complaint to the department. The allegations were that Father had used drugs and that he had physically abused Jonathan during parenting time. Father declared that those allegations were all false, and he noted that DCS had not attempted to place any limitations or restrictions on his parenting time "as a result of these baseless allegations." He also asserted that

[1] Mother's subsequent petition showed that she had in fact engaged a child psychologist, but the psychologist had never attempted to contact Father.

whoever made those allegations must have been someone very familiar with the parties' situation.

Father asked the court to find Mother in contempt, to award him additional parenting time, and to lift the supervision requirement from his parenting time because he had successfully maintained absolute sobriety for almost two years. Father later amended his petition to add an allegation that Mother had taken the child for doctor visits without notifying him, in violation of the court's orders, including several sessions with a psychiatrist.

On February 18, 2010, Mother filed an Emergency Petition to Suspend Visitation and for an Immediate Restraining Order. She alleged that DCS was investigating a complaint of child abuse against Father "as reported to DCS by the child's treating physician, Dr. Louise Strang." Attached to the Petition was the affidavit of Dr. Strang, a child psychologist who declared that she had been treating Jonathan as her patient since February 2009.[2]

Dr. Strang's affidavit stated that the child had recently disclosed to her incidents of sexual abuse perpetrated on him by Father. We do not believe it necessary to repeat the details of the alleged abuse in this opinion, but we note that if they were true, they would be serious enough to support criminal charges against the abuser. Dr. Strang stated that the child demonstrated behavioral symptoms consistent with such abuse, and she concluded that Father's visitation should be stopped immediately in order to preserve Jonathan's mental health.

The court did not grant Mother's request for an immediate restraining order, but it conditioned the child's future visits with Father on "direct contact supervision" and scheduled a hearing on Mother's petition within a week.

## III. The Hearing on Mother's Emergency Petition

The hearing on the Mother's emergency petition was conducted over several days, beginning on February 24, 2010. Before the witnesses were heard, the court declared that the allegations of sexual abuse in this case triggered the need for appointment of a guardian ad litem, and it accordingly signed an order appointing attorney Jessica Hooper to perform that role. The order stated that a guardian ad litem needed to be appointed because Mother "has made allegations of dependency and neglect regarding the minor child." Ms. Hooper was given the opportunity to participate in cross-examination of witnesses that day and in all subsequent proceedings.

The only witness to testify on the first hearing day was Dr. Strang. The psychologist stated that she had spent over 60 hours with Jonathan since he became her patient. She acknowledged that she had also spent about 30 hours with the lawyers involved in the case. She estimated that about half of her sessions with the child took place in Mother's house, rather than in her own office, which she conceded was somewhat unusual.

Dr. Strang testified that the most recent abuse disclosures occurred a just few weeks earlier, when Mother telephoned her, upset, in tears, and almost incoherent about what Jonathan had told her. Dr. Strang then came over to Mother's house, where she questioned the child, and he related the incidents that were reported in her affidavit. She also testified that Jonathan had demonstrated sexualized behavior in their last few sessions, which indicated to her that the child had indeed been sexually abused, and that he had revealed information to her that made her believe that Father was grooming him for sexual activity.

Dr. Strang also testified that Jonathan was afraid of Father, that he would become anxious as the time for scheduled visitation approached, and that he did not want to visit with Father, but only wanted to be with Mother. Dr. Strang admitted that she had never met or communicated with Father and that

[2] Dr. Strang denied that she had been the one to report the suspected abuse to DCS.

she had never observed Jonathan interacting with him. She testified, however, that she had not seen anything to make her believe that Mother had encouraged Jonathan to make false accusations against Father and that she believed that the child was safe in Mother's custody.

Father and Mother were both called to the stand when testimony resumed on March 1, 2010. Not surprisingly, their testimony painted two entirely different pictures of the facts of this case, and the witnesses called on behalf of each of them reinforced those differences. Father denied the allegations of abuse and testified that Jonathan was very comfortable, relaxed, and affectionate with him. He described some of the child's visits in detail, and submitted a videotape that he had made of a visit the previous summer to demonstrate their relationship. Photographs were also admitted into the record that appear to show carefree play between Father and Jonathan, and affection between Jonathan and his young cousins on Father's side.

Mother denied that she had ever prompted her son to make false allegations against Father, and she testified that she did not remember the child ever lying to her. She stated that she believed that Jonathan had been abused, based upon both the child's own statement and the professional evaluation of Dr. Strang. Mother was asked if she knew who reported the allegations of abuse against Father in December of 2009. She said that it was Dr. Heather Harris, a child psychiatrist who had seen Jonathan three or four times.[3]

Mother explained that she brought Jonathan to Dr. Harris to obtain further psychiatric recommendations because the child had become increasingly anxious, had nightmares, was chewing his nails, and wanted to wear gloves wherever he went. She admitted that she did not inform Father of those visits, but contended that the trial court's order only required her to inform Father of medical visits. She also admitted, however, that she did not inform Father that she took Jonathan to Dr. William Long, a pediatrician, for five visits between December 28, 2009 and January 27, 2010. Mother denied that Jonathan looked forward to parenting time with Father, that he was excited to see him, or that he appeared to enjoy parenting time.

The child's nanny testified that she had been working for Mother for nearly five months, and that Jonathan disclosed allegations of sexual abuse to her about three weeks earlier. She acknowledged that Mother had told her about the alleged abuse about three days before she heard about it directly from the child. She also testified that she had reported Father to DCS a few months earlier, because she suspected he was guilty of physical and psychological abuse.

The next witness to testify was Shatika Adams, an investigator for Child Protective Services, which is a unit within the Department of Children's Services. Ms. Adams described her first encounter with Mother and Jonathan at Mother's house after the report of sexual abuse. She interviewed the child privately in Mother's home, and began with a few innocuous questions to set the child at ease. When she asked about Father, Jonathan said that he was mean and evil. The child then described the alleged abuse in almost exactly the same terms as those testified to by Mother.

Ms. Adams noted that there were a few unusual features in the interview. She said Jonathan spoke about the alleged abuse in a very matter-of-fact way and that he was smiling the entire time. She asked the child when the abuse happened, and he said it happened at every visit. When she asked how many times it happened, he said "a gazillion times."

After the interview, Mother and Ms. Adams sat in the dining room quietly watching Jonathan play. The child then crawled over to his mother and asked, "where's my toy?" Mother appeared to be very upset about the question. Because of his tone and Mother's response, Ms. Adams wondered if the child had been offered a reward for telling his story.

[3] A letter by Dr. Harris, dated December 23, 2009 confirms this.

Ms. Adams testified that she asked Mother about her history with Father and that Mother described Father's history of substance abuse, but did not mention that he had been clean and sober for almost two years.

After leaving Mother's house, Ms. Adams went to Father's apartment for an unannounced visit. Father was shocked and stunned to hear about the allegation of sexual abuse against him. He gave his own version of the visit when the abuse allegedly happened. He said that his brother had supervised the visit and was in the apartment with his two children. They did not stay very long in the apartment, but went to Cool Springs to eat, where they ran into Father's sister-in-law and her two children. They then went to a rehabilitation facility to see Father's mother, who was a patient there.

Ms. Adams subsequently conferred with her superiors at DCS. They decided not to bar visitation, but to tighten the level of supervision. Ms. Adams contacted Father's stepfather, who was scheduled to supervise the next visit, and told him that there had been an allegation against Father, although she did not reveal any details. She instructed him that he was to keep both Father and Jonathan within his sight for the entire visit, and the stepfather agreed. Ms. Adams then called Mother to tell her that visit would occur as scheduled. She reported that Mother was very upset, for she apparently believed that on the strength of the allegations against Father, DCS would not permit further visitation with him.

Three of Father's relatives testified: his brother Craig Bruehl, his sister-in-law Kaelin Bruehl (wife of Father's other brother) and his stepfather Hal Lane. All of them had participated at various times in supervision of Father's visitation. Craig Bruehl testified that his children, ages nine and twelve, love playing with Jonathan, and that he had never seen anything inappropriate occur between Father and Jonathan during visitation. He further testified that Jonathan never appeared depressed, anxious or fearful around Father, but rather that the two of them always had fun together.

Craig Bruehl also testified about the exchange of the child between the parents. The court's order stated that Father's visitation would begin at 10:00 a.m. on Saturdays. Whenever he and Father arrived a few minutes early, Mother would just sit in the car with the child and would not let him out until exactly 10:00. Mr. Bruehl observed that as the end of his visits with Father approached, Jonathan always seemed to become nervous about leaving. His impression was that Jonathan was afraid to show his mother that he actually had fun with Father or with his cousins.

Kaelin Bruehl also testified that she had never observed inappropriate behavior by Father, or anything that could be interpreted as sexual. Her two children are aged six and three, and she is a child care provider at the YMCA. As part of her job, she had to take a course in child abuse prevention training. She testified that she wouldn't hesitate to leave her children with Father. Like her brother-in-law, Kaelin testified that Jonathan enjoys visitation, but that he shows anxiety as the time to leave approaches. Both Craig and Kaelin confirmed Father's account of the happenings on the day when the first alleged episode of sexual abuse occurred. Kaelin's description of Mother's behavior when the child was exchanged was similar to Craig's testimony.

The next witness to testify was Lisa Dupree, a social worker at Our Kids Center at Nashville General Hospital, which she described as "a forensic evaluation unit for children when there are allegations of sexual abuse." Ms. Dupree has worked for Our Kids for 18 years and had examined over 5,000 children during that time. She testified that Mother brought Jonathan to her office on March 15 and then again on March 20. The proof showed that Mother also brought Jonathan to the Nashville Children's Alliance for a separate forensic interview the day before.

Ms. Dupree testified that the child appeared to be anxious and distressed. She also testified that as

Mother and child were waiting for the child to go to the examination room, Jonathan turned to Mother and said, "Can you remind me what I'm supposed to say, mommy? Please, can you remind me what I'm supposed to say?" Ms. Dupree further testified that at her private interview with Jonathan, the child told her about being abused, in terms similar to those referred to earlier and then said, "There is something else I'm supposed to tell you, but I can't remember the third thing. Can I go ask my mom the third thing I'm supposed to say?"

At that point, Ms. Dupree told Jonathan that it was okay for him to just tell her the things he remembered. She reported that he then spontaneously said, "Stephen's brothers and his whole family they were there and they did it too. And their wives do the bad things too. And their two kids are a bad influence, because they showed me how to shake my butt."

Ms. Dupree was asked whether or not she believed that Jonathan had been abused. She testified that her role was simply to gather evidence, and that she did not reach any firm conclusions about the presence or absence of abuse. She did, however, state that repeated questioning and examination of a child on matters related to sexual abuse can have a detrimental effect on the child's development.

At the conclusion of the hearing, the trial court did not issue a ruling on Mother's petition, declaring that it would wait until it heard the evidence on Father's contempt petition. The court also declared that it wanted to select a neutral psychiatrist for the child, who could work with both parents, but that for the time being the child's counseling sessions with Dr. Strang could continue, as well as any investigative proceedings by DCS that were legally required. Mother was barred from taking the child to any other therapists or investigators until further notice.

## IV. THE HEARING ON FATHER'S PETITION

Testimony resumed on April 15, 2010. The proof that was presented included testimony relevant to both Mother's emergency petition and to Father's petition for contempt and for additional parenting time. The attorneys acknowledged that the evidence overlapped, and they did not object to the trial judge's announcement that she would enter a separate order on each petition, but would consider all the testimony that was relevant to each order, regardless of the purpose for which it was submitted.

Testifying witnesses included a Belle Meade police officer and a Metro Nashville police officer, both of whom had been present in the Belle Meade police station on January 17, 2010, when Jonathan was scheduled to be transferred to Father's care for visitation. The Belle Meade officer testified that when Mother brought the child into the station he was frightened, hysterical, and pacing up and down.

The officer testified that he did not know what set the child off, but that there was nothing that he, the mother, or the other officers could do to calm him down. The child said he was afraid to go with his father, so the officer took it upon himself to walk over to where Father was waiting, and told him that there would be no visitation that day. Father was cordial, and he drove away. The officer testified under cross-examination that he had been present on other occasions before and after January 17, when Jonathan was brought to the police station for visitation, and that on those occasions, the child seemed happy and normal.

The Metro officer testified that he had been called to the Belle Meade Police Department on January 17, and that when he arrived, Father had already left. The child appeared to be scared, and he kept saying that he wanted to go home. The officer also testified that he had been dispatched to Mother's home a few weeks before the episode at the Belle Meade police station, because Mother reported that the child had suffered some bruises while in Father's care.

The bruises were alleged to be on the child's buttocks, upper thigh area and arm. Jonathan did

not want to show his bottom to a stranger, but Mother had him pull down his pants to show the officer the bruises on his buttocks. The officer did not see any bruising there or anywhere else that Mother indicated. He was dispatched to Mother's house again, about a month after January 17, and Mother showed him photographs of Jonathan's thighs, arms and buttocks to demonstrate what she said had happened to the child when he was in Father's care. But the officer did not see anything on the photos that looked like bruises.

Dr. Strang was then called to the witness stand once again, and she testified about a counseling session that she had conducted with Jonathan on April 5, 2010, the Monday after a weekend visitation. She read from the notes she had taken from that session, which recited the child's account of additional acts of aggression against him by Father, some of them even more bizarre and frightening than had been previously reported.[4]

One of the acts described was Father putting legos in the child's mouth so he couldn't breathe. Dr. Strang acknowledged that she wrote a letter to the guardian ad litem describing all of the child's abuse disclosures from that session. She testified that she felt she had a duty to warn, because of the danger that the child could choke on the legos. She also testified that the child suffered from a lot of fears. He was afraid of ghosts, vampires and mummies, and also of going to the hospital and being taken to jail. She attributed all his fears to being around Father, although at a different point in the questioning she acknowledged that she didn't know that for sure. She testified that she had no plans to do family therapy, and that the only solution to the child's problems would be to end Father's visitation.

At the conclusion of Dr. Strang's testimony, the court asked both parties to submit the names of three neutral therapists who could work with both parents, and declared that the choice would be for the court to make. The parties submitted several names at a subsequent hearing. The court ultimately appointed Dr. Murphy Thomas, a clinical and consulting psychologist and former President of the Tennessee Psychological Association, to serve as the family therapist.

The hearing resumed once again on April 21, 2010. Father was the only witness to testify. He was asked if he thought that Mother invented the accusations against him and told the child what to say. Father denied that he believed that she had done so, but stated that he learned from other testimony in this case that Mother "has had a habit of saying very bad things about me to him over the last two years. And I believe if the child hears bad things from his mother about his father over a long enough time, he can learn that all his mother wants to hear is negative things, so that's what he gives her."

Father testified that he thinks Mother is still really angry at him. He noted that she almost never acknowledged any communications from him, even when he relayed important information about Jonathan to her, and that she did not keep him informed about the child's doctor visits. He also testified that he communicated with Mother mainly by e-mail, and that there continued to be some interference with his phone calls to the child. He further testified that Jonathan has indicated to him that he was aware of what was going on in the case, even though the court prohibited both parties from discussing it with him. He also stated that he did not make disparaging remarks about Mother, but tried to let Jonathan know that it was okay for him to love both his parents.

Father also submitted documentary evidence of his compliance with the requirements of the Tennessee Colleague Assistance Foundation, an organization that monitors the progress of psychologists in recovery from substance abuse. He said that he started participating in the program in January of 2009, and that he was told it was no longer necessary in January 2010. He testified that he also

[4] We note that as Jonathan underwent more therapy sessions and assessments, his accounts got increasingly graphic, even as the degree of supervision over Father's visits intensified.

goes regularly to the meetings of Caduceus, another organization for health care professionals in recovery. He also submitted a letter from Ellen Trice of Vanderbilt's Employee Assistance program, which indicated that all his drug tests were negative. He testified that he still works for Vanderbilt, and that drug screens are a condition of employment.

### V. SUBSEQUENT PROCEEDINGS

The next significant event in this case was the filing of Father's motion on May 20, 2010, to suspend Dr. Strang's involvement with the child. Father contended that Dr. Strang had crossed professional boundaries by placing a phone call to Father's father, Dr. Richard Bruehl ("Grandfather"), also a psychologist, and leaving a voice mail that discussed his grandson's situation.[5]

Father attached Grandfather's affidavit to his motion, together with a recording of the voice mail and a transcript of that recording. Dr. Strang told Grandfather that she was available to talk to him if he wished, and stated, "[t]he little guy is suffering terribly, and if I can do anything in any way to help him, I will." Grandfather's affidavit stated that Dr. Strang's message was highly inappropriate and a possible violation of patient confidentiality and that she had crossed the line from being the child's therapist to become an advocate and/or forensic investigator.

The guardian ad litem subsequently filed an ex parte emergency motion in which she recommended that the court take several steps to protect Jonathan. She cited Lisa Dupree's concern that repeated examinations of the child could have a detrimental affect on him and noted that after Ms. Dupree testified, Mother had presented Jonathan to at least three other medical professionals in regard to the sexual abuse allegations. She also stated that she had seen multiple photographs of the child which showed a full body rash or hives, and that Mother had alleged that Jonathan begins to suffer from the rash or hives after parenting time with Father.[6] She further noted that Dr. Strang was unwilling to include Father in any counseling with the child or with herself and that the psychologist had moved into more of an investigative role than a therapeutic one.

The trial court adopted the guardian ad litem's recommendations. In an order dated June 3, 2010, the court enjoined all parties from presenting the child for a forensic evaluation at any institution without the permission of Lisa Dupree. The court further ordered that the child be presented for therapy with Dr. Murphy Thomas, and that he not be presented for therapy to any other professional without explicit permission from the court, thereby effectively removing Dr. Strang from acting as the child's therapist. Jonathan's visits with Father were also suspended until he could meet with Dr. Thomas.

The trial court also filed an interim order regarding the petitions filed by both parents. The court cited the numerous hearing days at which proof had been heard, and declared that "[t]his Honorable Court finds, by clear and convincing evidence, that the father had not sexually abused the minor child at issue." The court further found that Father had not acted inappropriately with Jonathan, but that the child did appear to be in a state of emotional distress. The court attributed the child's distress to his relationship with both parents as well as the relationship between the parents.

The court also ordered both parents to contact Dr. Murphy Thomas within 24 hours to allow Dr. Thomas to provide counseling services to the child and to collaborate with the parents. The court declared that it would make additional findings of

[5] Grandfather's Curriculum Vitae, which was attached to Father's motion, showed that aside from being a licensed marital and family therapist, Grandfather was also a licensed clinical pastoral therapist and had previously been the pastor of a Methodist Church and the Director of Pastoral Services for Vanderbilt University Hospital.

[6] The photographs were made a part of the record.

fact after Dr. Thomas has made a report to the court and would enter a separate order regarding the alleged acts of contempt by Mother. On June 23, 2010, Mother filed an emergency motion for permission to file an interlocutory appeal of the court's interim order of June 3. The motion was denied.

On July 1, 2010, Dr. Thomas testified about his initial findings and was questioned by the attorneys for both parties and by the guardian ad litem. He reported that he had met with Mother and Jonathan at the Discovery Museum in Murfreesboro and also with Father and Jonathan at the Cumberland Science Museum in Nashville. Dr. Thomas brought his own grandson, who was about the same age as Jonathan, on both museum visits. He explained that he wanted Jonathan to feel safe and comfortable around him, and that he had deliberately avoided seeing the child in an office environment "because children quickly learn here's what you say in this kind of setting."

During the Nashville museum outing, Dr. Thomas had the opportunity to observe Jonathan's interactions with Father over a period of time. He noted that Jonathan showed no fear in Father's presence and was very affectionate with him, often spontaneously taking his hand. He stated that "the child reacted in a way one would not expect given that history of abuse."

After they left the museum, they all went to lunch together. Dr. Thomas continued to observe Jonathan and Father during the meal and as they lingered afterwards. Dr. Thomas then had to return Jonathan to Mother's home, but he did not have his GPS with him, so he asked Father to show him the way. Dr. Thomas testified that he strapped his grandson and Jonathan into the child seats in the back of his car, and that Father led the way in his own car. As they approached Mother's house, Father reached out the car window to point to the correct house. At that point, the child gave the only hint of any apprehension on his part that Dr. Thomas observed, when he said, "Oh, no. Mother hates him."

Dr. Thomas also met with Mother and Jonathan at Mother's house. He spoke to Mother at length, and played with Jonathan for an hour and a half. He noted that during the course of their play, Jonathan never mentioned the subject of abuse. Dr. Thomas deliberately did not ask about abuse, because, as he testified, "if you read the research on this, you come to find out one of the most pernicious things is repeated interviewing of children around his age around those issues." Notably, however, when Dr. Thomas spoke to Jonathan's nanny, she told him that after his session with the child, she had asked Jonathan if he had told Dr. Thomas about abuse. When the child said no, the nanny said, "why didn't you tell him you'd been abused?"[7]

Dr. Thomas testified that he had also managed to speak to most of the professionals involved in Jonathan's care, including several who had reported the possibility of abuse to DCS. He noted that healthcare professionals have a legal duty to report possible abuse, and that there was a very low threshold to trigger the duty to report, so the existence of such a report did not necessarily mean that the reporting party believed that abuse had occurred.[8] Dr. Thomas was asked in several different ways about his own opinion, and he stated that "I have within a reasonable degree of certainty concluded that this child has not been sexually abused and physically abused." He acknowledged, however, that he had to keep the question open, because "one cannot logically, reasonably prove a negative," and that it was a good idea to remain vigilant.

Dr. Thomas further stated that Jonathan needed to have a healthy relationship with both his parents,

[7] Dr. Thomas referred to her as "Jonathan's current nanny." It is unclear whether she is the same person who made the first report of abuse to DCS, and who testified at the hearing of March 1, 2010.

[8] *Tenn. Code Ann. § 37-1-403(b)* requires any person who knows or has reasonable cause to suspect that a child has been sexually abused to report it to DCS, the juvenile judge, the county sheriff, or the chief law enforcement officer of the municipality where the child resides.

and that he was willing to continue to work with the family with the goal of promoting those relationships. He declared that in order to achieve that goal it would be necessary for the parties to move from supervised to unsupervised visitation. He suggested, however, that supervised visitation continue for a short period of time, a few more weeks or months at most, but with a different person in the supervisory role, partly for the benefit of Mother, since she does not trust Father's family members.

Turning to Mother's behavior, Dr. Thomas observed that she genuinely believed that Father had abused Jonathan, and that in light of the information she received from Dr. Strang, he understood why she was prepared to do everything she could to prevent such abuse from happening again. Dr. Thomas further explained that he had discussed those issues with Mother and that he urged her to consider the possibility that she was mistaken about the alleged abuse. He reasoned that the child's testimony was contaminated, and that as a scientist, Mother should understand that when you have bad data, you are to apt draw incorrect conclusions.

The trial court filed an order on July 13, 2010, reinstating Father's visitation schedule with supervision, as previously ordered. The court found that Jonathan was in desperate need of a healthy relationship with Father, and that "the child's actions and accusations appear to be based on confusion and a desire to respond in a way that he perceives those around him want him to respond, rather than based in the truth." Since Mother had not yet approved of any supervisor, the visitation was to be supervised under the direction of the guardian ad litem and Dr. Thomas, who were authorized to choose family members, professional supervisors or social workers for the task.

A number of motions were filed subsequent to the trial court's order, which indicated that Dr. Thomas had not managed to dispel Mother's fears or to significantly change her understanding of the situation. A motion by the guardian ad litem, filed on August 5, 2010, alleged that Mother would not allow a joint meeting between her psychiatrist and Dr. Thomas. The guardian asked the court to compel Mother to cooperate with Dr. Thomas, and to provide Jonathan's school with contact information for Father, which she had withheld.

Mother filed an emergency motion on August 19, 2010, asking the court to stay the implementation of a directive by the guardian ad litem that overnight visitation could begin. The court denied Mother's motion and ordered overnight visitation. Mother also filed a motion on September 3, 2010, to clarify proceedings and designate them as dependent and neglect proceedings, pursuant to *Tenn. Code Ann. § 37-1-102(b)*.

The guardian ad litem filed a notice of her intention to have Dr. Thomas qualified as an expert witness in child psychology. For her part, Mother filed a motion on September 10, 2010, to disqualify Dr. Thomas from any further participation in the case, to strike his entire testimony from the record, and to reinstate supervised visitation "with an appropriate, neutral, impartial, and qualified supervisor." The motion was based on alleged conflict of interest arising from one of Dr. Thomas' professional associations. We will discuss that allegation later in this opinion.

The pending motions were heard over two days, on September 13 and 14, 2010. Dr. Thomas' curriculum vitae was submitted to the court and he was qualified as an expert witness without objection by any party. Dr. Thomas was also questioned about his interactions with Mother, Father, and Jonathan which had occurred after the hearing of July 1, 2010. He stated that Mother told him that she was 99 percent sure that Father had abused Jonathan and that she was unwilling to work with anyone who would expose the child to the possibility of further abuse. Dr. Thomas testified, however, that whenever he was able to convey information to her that would tend to negate the possibility that abuse had occurred on any

particular occasion, she appeared to be disappointed rather than relieved to learn that Jonathan had probably not been abused. He stated that in his opinion, she was not looking for answers, but rather for confirmation of her belief that Father was an abuser.

Dr. Thomas also testified that his conclusion that there had been no abuse by Father and that Father's relationship with Jonathan was a healthy one was not based on the court's findings, but upon his own observations. These included separate meetings with both parents, a therapeutic session with both parents together, additional outings with Jonathan, meetings with current and former nannies, communications with numerous experts including Dr. Strang, and discussions with Mother's psychiatrist as finally agreed to by Mother. He observed that Father tried to encourage Jonathan to have a positive relationship with Mother, but that her goal appeared to be to end the child's relationship with Father.

Dr. Thomas stated that he wanted to maintain an open mind, that he had considered every point that Mother made, and that he was also willing to consider any additional evidence that Mother might present. While he continued to believe that the child's best interest would be served by the parents getting along and co-parenting, he had concluded that because of Mother's resistance, such a resolution was not a viable option. He also stated that it would benefit the child to spend more time with Father, and it would be better for any exchange of custody to take place, whenever possible, at Jonathan's school rather than at the police station.

Another testifying witness was Mary McNulty, a social worker who had formerly worked for Georgia's version of the Department of Children's Services, and who had been contacted by the guardian ad litem to supervise Father's visitation with Jonathan. She testified that she had supervised six visits, during which, in accordance with her instructions, she never let Jonathan out of her sight or her hearing, even during bathroom breaks, and that she never left him alone with Father. She further testified that she had never seen Father do anything to cause her to have concern about his relationship with the child, and that Jonathan seemed to enjoy the visits very much.

She noted, however, that as the end of every visit neared, Jonathan began showing symptoms of anxiety. These included his repeatedly asking what time it was, as if he was afraid of returning late. She also testified that during almost every visit he voiced worry at some point that his mother or grandmother would find out that he had fun during his visit with Father.

Mother and Father both took the stand once again. Mother testified on direct examination that after every unsupervised visitation, which began on August 7, 2010, Jonathan would make detailed disclosures of physical and sexual abuse, and that he would show her bruises where Father allegedly hit or kicked him. She declared that she believed everything he said because she never knew the child to lie to her.

Mother was also asked about an earlier report she had made to Dr. Thomas that Jonathan told her that Father had hit him and threatened him during supervised visitation on July 4, 2010. Ms. McNulty had been supervising that visitation, and she testified that nothing like that had happened or could have happened during that visit. Mother was asked if she had any reason not to believe Ms. McNulty's testimony, but she avoided answering the question. In fact, Mother tried to avoid directly answering almost every question that was asked by Father's attorney or by the guardian ad litem. She responded to many specific questions about her actions, her intentions or her beliefs by simply insisting that she had followed the court's orders, and then repeating the same statement in response to follow-up questions.

When Father took the stand, he was asked about Jonathan's adjustment to overnight visitation, which had begun on August 17, 2010. He said that

Jonathan was nervous about sleeping alone at first (the proof showed that he usually slept with Mother, and that he still drank from a bottle), but that Father had involved the child in decorating and painting his room, and that Father's girlfriend had allowed him to borrow her puppy to keep the child company. As a result, Jonathan seemed to become comfortable with the idea of sleeping alone, and he was now sleeping through the night.

Father was also asked about whether he wanted to become Jonathan's primary caretaker. He answered that he would like to have more time with Jonathan, but that he wanted the child to have a lot of time with both parents. At the conclusion of Father's testimony, the attorneys delivered very brief closing arguments. The guardian ad litem recommended that the child be allowed to live with Father and that Mother exercise regular visitation. She stated that under the circumstances, such an arrangement was Jonathan's only chance for a normal life. The trial court did not issue a ruling from the bench.

## VI. THE FINAL ORDER

On November 12, 2010, the trial court entered a 45 page final order that addressed all the petitions and motions before it, including Mother's motion to have the proceedings deemed to be dependency and neglect proceedings. The court noted that Mother had never filed a petition to adjudicate the child dependent and neglected and had never prayed for any relief that would have been available upon a finding of dependency and neglect. The court accordingly dismissed Mother's motion and declared that it was proceeding on the issue of parenting, which was implicated in both Mother's motion to suspend Father's visitation and Father's petition for a modification of parenting.

The court then set out the history of the case in detail, summarized the evidence presented, and discussed the credibility of the testifying witnesses. Among other things, the court declared that it found Ms. Dupree to be a highly credible witness, "based on her experience, her history as an expert witness and her knowledge of the facts at hand." The court likewise found Dr. Thomas to be very credible, based in part on the thoroughness and the professionalism of his approach to the very serious question of possible sexual abuse. Ms. McNulty was also found to be credible. Conversely, the court found that neither Mother nor her nanny were credible witnesses, and that Dr. Strang had not acted as a neutral professional and that she was not a credible witness.

In light of the evidence presented, the court determined that a material change of circumstances had occurred since its last order involving custody of the child. The court found that Mother had engaged in a deliberate process of alienation by accusing Father of abusing the minor child, that she had refused to consider any evidence that the alleged abuse had not occurred, and that her obsession had led her to subject the child to multiple physical and verbal interviews and examinations of the child, which were not merited, did not produce any valid disclosures, and were detrimental to the child's well-being.

The court then conducted a detailed analysis of the best interest of the child in accordance with each of the factors set out in *Tenn. Code Ann. § 36-6-106(a)*. The court determined that those factors indicated that Jonathan's best interest lay in a modification of parenting time that would make Father the child's primary residential parent. The court identified the factor set out at *Tenn. Code Ann. § 36-6-106(a)(10)* as especially relevant:

> Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

The court accordingly dismissed with prejudice Mother's petition to suspend Father's visitation and

named Father as Jonathan's primary residential parent, with Mother to receive ample alternate parenting time. Father was given primary decision-making responsibility, and Mother was ordered to pay child support. The court also awarded Father the attorney fees he incurred in this litigation and awarded judgments to the guardian ad litem and Dr. Thomas for their services. Mother subsequently filed a motion for a stay of the trial court's order, and a motion to amend the order. Both motions were denied after a hearing. This appeal followed.

## VII. Mother's Petition to Suspend Visitation

Mother's first argument on appeal is that the trial court applied the wrong standard of proof to her emergency petition to suspend Father's visitation. She asserts that the trial court incorrectly applied the more stringent clear and convincing evidence standard that applies to allegations of dependency or neglect, *Tenn. Code Ann. § 37-1-129(c)*; *In re Audrey S., 182 S.W.3d 838, 875 (Tenn. Ct. App. 2005)*, when it should have applied the preponderance of the evidence standard, which applies to petitions to modify a prior parenting plan, *Tenn. Code Ann. § 36-6-101(a)(2)(B)*. Mother maintains that, as a result of the trial court's application of the wrong standard to her petition, the orders of June 3, 2011, and November 12, 2011, should be vacated.

The order of June 3 was an interim order, entered after seven days of testimony, in which the court found that Father had not abused or otherwise acted inappropriately with the child. The court also ordered the parties to cooperate with Dr. Thomas in providing counseling for the child. The order stated that the court would make additional findings and conclusions after a report from Dr. Thomas. In the order, the trial court found "by clear and convincing evidence, that the father has not sexually abused the minor child at issue."

After Dr. Thomas testified on July 1 that he did not believe that Father had sexually abused Jonathan and recommended a change from supervised to unsupervised visitation, Mother filed on September 3 her Motion to Clarify the Proceedings and to Designate them as Dependency and Neglect proceedings.[9] In its final order of November 12, 2010, the trial court denied Mother's motion, noting that just because a party has made allegations that sound in dependency and neglect, those allegations in and of themselves do not create a petition to adjudicate a child dependent and neglected.

A fair reading of the June 3 order demonstrates that the trial court did not subject Mother's petition to the standard of clear and convincing evidence. Where dependency and neglect is alleged, the party attempting to prove dependency and neglect, not the person denying it, carries the burden of proof, and must prove its allegations by clear and convincing evidence. *Tenn. Code Ann. § 37-1-129(c)*; *In re Audrey S., 182 S.W.3d at 875*. The trial court did not find that Mother failed to meet this burden of proof. Instead, it found that Father had disproved the allegation by clear and convincing evidence. Implicit in the court's affirmative finding that Father did not abuse the child is the conclusion that Mother did not prove abuse by a preponderance of the evidence.

The question of whether the child had been abused was the focus of a long course of motions and hearings. However, the allegation first arose in Mother's Emergency Petition to Suspend Visitation and for an Immediate Restraining Order. The hearings also involved Father's petition to modify parenting, the resolution of which was inseparable from the question of abuse. Mother could have filed a petition to adjudicate Jonathan as dependent and neglected early on if she wished,[10] and she could have sought the remedies available to the juvenile

[9] It is not clear to us why Mother would benefit from such a change since she argues that the trial court erroneously applied the dependency and neglect standard of proof to her petition.

[10] The trial court suggested that the higher standard of proof required in dependency and neglect proceedings might have been one reason that Mother's attorneys chose not to file a petition for dependency and neglect.

court in such an action. But she did not do so, and she did not object while her petition to suspend visitation and Father's petition for modification of parenting proceeded in tandem.

Mother cites the case of Strunk v. Lewis Coal Co., 547 S.W.2d 252 (Tenn. Crim. App. 1976) for the proposition that the application of the wrong standard of proof in a proceeding can amount to a violation of due process and require the reversal of a trial court's order. In that case, the trial court found union picketers guilty of contempt by the preponderance of the evidence for violating an injunction, and it fined them and sentenced them to jail. The Court of Criminal Appeals reversed, declaring that the alleged contempt was criminal in nature, rather than civil, thereby requiring that the defendants' guilt be established beyond a reasonable doubt.

The present case has very little in common with Strunk v. Lewis Coal. The trial court in Strunk found the defendants guilty by a less stringent standard of proof than is required to establish guilt in criminal cases, and it imposed punishment on them without ascertaining whether the same result could have been reached by the application of the correct standard. In contrast, the court's order in the present case indicated that it may have applied a more stringent standard of proof, but to Father, not Mother. If the evidence was clear and convincing that Father did not abuse his child, then that same evidence obviously supported a finding that Mother did not prove the allegations by a preponderance of the evidence.

Further, the order that the appeals court reversed in Strunk v. Lewis Coal was the lower court's final order. "[A] final order fully and completely defines the parties' rights with regard to the issue, leaving nothing else for the trial court to do." Hoalcraft v. Smithson, 19 S.W.3d 822, 827 (Tenn. Ct. App. 1999)(citing State ex rel. McAllister v. Goode, 968 S.W.2d 834, 840 (Tenn. Ct. App. 1997)). The order complained of in the present case was an interim order, which only adjudicated the issue preliminarily. "Until a judgment becomes final, it remains within the court's control and may be modified any time prior to the entry of a final judgment." Hoalcraft v. Smithson, 19 S.W.3d at 827 (citing Stidham v. Fickle Heirs, 643 S.W.2d 324, 328 (Tenn. 1982)).

In its final order, the trial court acknowledged the error in its earlier assumption that it was dealing with a neglect and dependency case. We have determined that the trial court did not apply the incorrect standard of proof to Mother's petition in its June 3 order and that, even if it had, the final order was not the product of application of an incorrect standard. We have studied Mother's arguments, and hold that there is no basis for vacating the orders challenged by Mother.

## VIII. Modification of the Parenting Plan

A decision on a request for modification of a parenting plan or a change of custody requires a two-step analysis. Cranston v. Combs, 106 S.W.3d 641, 644 (Tenn. 2003). A party petitioning to change an existing custody order must prove both (1) that a material change of circumstances has occurred and (2) that a change of custody or residential schedule is in the child's best interest. Kendrick v. Shoemake, 90 S.W.3d 566, 575 (Tenn. 2002). Only after a threshold finding that a material change of circumstances has occurred is the court permitted to go on to make a fresh determination of the best interest of the child. Kendrick, 90 S.W.3d at 569; Blair v. Badenhope, 77 S.W.3d 137, 150 (Tenn. 2002); Curtis v. Hill, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006).

As to the first requirement, i.e., a material change of circumstances, the Tennessee Supreme Court has stated:

> Although there are no bright line rules as to whether a material change in circumstances has occurred after the initial custody determination, there are several relevant considerations: (1) whether a change has occurred after the entry

> of the order sought to be modified; (2) whether a change was not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way.

Cranston v. Combs, 106 S.W.3d at 644 (citing Kendrick v. Shoemake, 90 S.W.3d at 570).

Resolving questions of custody and parenting are among the most important decisions that this court is called upon to decide. Boyer v. Heimermann, 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007); Gaskill v. Gaskill, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). When allegations of abuse are an element in that decision, the stakes become that much higher. As this court has stated in a case similar to the one before us,

> Accusations of child sexual abuse by one parent against the other parent presents one of the most difficult issues faced by a trial court. Suspicion of such abuse must be taken seriously and were investigated thoroughly, for the consequences to the child of allowing any abuse to continue are grave. However, mistakenly concluding that a parent has abused his child, when in fact there has been no abuse, has serious consequences as well, including the almost-certain destruction of the parent-child relationship and disgrace to the accused parent.

Keisling v. Keisling, 196 S.W.3d 703, 722 (Tenn. Ct. App. 2005). *See also* Byars v. Young, 327 S.W.3d 42 (Tenn. Ct. App. 2010).

Whether or not Father physically or sexually abused his child is a question of fact. On appeal, we review the trial court's findings of fact *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); Blair v. Brownson, 197 S.W.3d 681, 684 (Tenn. 2006); Bogan v. Bogan, 60 S.W.3d 721, 727 (Tenn. 2001); Hass v. Knighton, 676 S.W.2d 554, 555 (Tenn. 1984).

When the evidence is in conflict and the trial court bases its factual findings on witness credibility, we must give considerable deference to those findings, because the trial court is in a far better position to observe the demeanor of the witnesses than is the appeals court. McCaleb v. Saturn Corp., 910 S.W.2d 412, 415 (Tenn. 1995); Fell v. Rambo, 36 S.W.3d 837, 846 (Tenn. Ct. App. 2000). However, we review a trial court's conclusions of law *de novo*, with no presumption of correctness. Whaley v. Perkins, 197 S.W.3d 665, 670 (Tenn. 2006); Union Carbide Corp. v. Huddleston, 854 S.W.2d 87, 91 (Tenn. 1993).

It is undisputed that Jonathan told a number of adults that Father had committed acts against him that can only be described as extremely abusive and perverse. The three witnesses who accepted the five year old's statements as true were Mother, her nanny, and Dr. Strang. The proof showed that Mother refused to believe that her son was not telling her the truth, or even to consider any evidence that would tend to negate the possibility that he had been abused.

All of Dr. Strang's information came from Jonathan and from Mother. She stated that Jonathan's behavior during therapy was consistent with the abuse that had been reported. She recommended that Father's visitation rights be terminated, but she was not willing to meet with Father to test the truth of her conclusions. Dr. Strang and the nanny were both employed by Mother.

Jonathan also described the alleged abuse to Shatika Adams of DCS and Lisa Dupree of Our Kids Center, seasoned professionals in dealing with child abuse who did not appear to have any motive to shape their testimony in order to meet the expectations of either party. Both observed some odd things during their encounters with the Jonathan. Ms. Adams testified that the child spoke about the alleged incidents of abuse in a very matter-of-fact way and smiled as he described them, which she found to be inconsistent with the trauma she would expect to result from such horrendous experiences. After meeting with

Jonathan and Mother, Ms. Adams paid a surprise visit to Father in order to hear his version of the events of the day the sexual abuse allegedly occurred. His account of that day was inconsistent with the possibility of abuse, but consistent with the testimony of his brother and his sister-in-law, who were involved in supervising visitation.

Ms. Dupree testified that Mother brought Jonathan to Our Kids Center twice in five days for a forensic examination. There was also proof of a separate examination at a different facility between the two appointments at Our Kids Center. Ms. Dupree testified that Jonathan told her about the alleged abuse, but made statements both before and during the examination which led her to suspect that he had been coached by Mother. Unlike Dr. Strang, neither Ms. Adams nor Ms. Dupree was willing to unequivocally state whether or not Jonathan had actually been abused. But Ms. Dupree testified that repeated examinations of the child could be harmful to him.

The trial court appointed Dr. Murphy Thomas to work with both parents and with Jonathan to try to improve their family situation. He was able to observe interactions between Jonathan and Father, between Jonathan and Mother, and (during one eighty minute session in his office) between Mother and Father. He also consulted with other professionals who had been involved in the child's care, including Dr. Strang. He never asked the child anything about abuse, and the child never volunteered any information.

Dr. Thomas observed, however, that there was an affectionate relationship between Father and child, and he did not see anything to suggest that there was a history of abuse or that Jonathan was afraid of his father. In fact, the only sign of fear he was able to observe in the child occurred when he brought him back to Mother's home after visitation with Father. On the basis of his independent observations, Dr. Thomas concluded that the alleged abuse had not occurred, and he warned that reinforcement of a false narrative of abuse might lead the five year old child to find his ultimate identity as an abuse victim.

The trial court explicitly found Ms. Dupree, Dr. Thomas and Ms. McNulty to be credible witnesses. Conversely, it found that neither Mother, her nanny, nor Dr. Strang were credible. Other witnesses offered testimony that was inconsistent with the possibility of child abuse. For example, those who supervised the child's visitation testified that the abuse that was reported to have occurred during their supervision could not have happened without their being aware of it. Ms. McNulty testified in detail about how she did not let Jonathan out of her sight or hearing, even during bathroom breaks. Mother refused, nonetheless, to retreat from her belief that abuse had occurred during supervised visitation with Ms. McNulty.

In sum, the evidence does not preponderate against the trial court's findings that Father was not guilty of sexual abuse and that Mother's repeated accusations of abuse were largely fueled by her desire that Father be removed from the child's life. The evidence also does not preponderate against the court's finding that the child's stories of abuse and Mother's conduct in response to those stories amounted to a material change of circumstances. The proof showed that it occurred after the entry of the original parenting plan; it could not have been reasonably anticipated when the plan was entered; and it affected the child's well-being in a meaningful way.

Finally, the trial court found that it was in the child's best interest that Father be named as his primary residential parent. The court discussed all of the best interest factors set out in *Tenn. Code Ann. § 36-6-106(a)* and stated that most of them either favored both parents equally or gave Father the edge. But the court found ample evidence that Mother was not willing to allow Jonathan to enjoy a close relationship with Father, while Father was prepared to encourage and foster a positive relationship between Mother and child. The evidence does not preponderate against the trial

court's conclusion.

Mother challenges the trial court's decision on appeal by, among other things, invoking the frightening possibility that an error by the court would lead to the delivery of an innocent child into the hands of an abuser. But the trial court was clearly aware of the delicacy and the dimensions of the task before it. It proceeded carefully, treating Mother's allegations of child abuse with the seriousness that such allegations deserve. It suspended Father's visitation at one point, and then allowed it to resume, but only under supervision. It continued that supervision even as the mounting evidence made the truth of Mother's allegations more and more doubtful. Other measures taken by the court to protect the child included the appointment of a guardian ad litem to advocate for his interests, as well as of a neutral therapist, Dr. Thomas, to determine whether the parents could work together for the child's benefit.

Mother also argues that by transferring custody of Jonathan to Father, the trial court was in violation of *Tenn. Code Ann. § 36-6-112*, the Protective Parent Reform Act ("PPRA") which reads in relevant part,

> (b) If a parent makes a good faith allegation based on a reasonable belief supported by facts that the child is the victim of child abuse, child neglect, or the effects of domestic violence, and if that parent acts lawfully and in good faith in response to that reasonable belief to protect the child or seek treatment for the child, then that parent shall not be deprived of custody, visitation, or contact with the child, or restricted in custody, visitation, or contact, based solely on that belief or the reasonable actions taken based on that belief.

Mother contends that it was reasonable for her to believe the allegations of abuse made by her child, and that she acted in good faith to protect him from further abuse. We note that Mother first raised the issue of the PPRA in the supplement to her motion to alter or amend, filed on December 8, 2010.

We will assume that Mother's initial allegation that her child had been abused was made in good faith, for it was based upon the child's own account of visitation with Father. We also cannot fault Mother for trying to protect her child from further abuse so long as her belief was reasonable. Mother attempted to obtain independent confirmation of the alleged abuse by reporting it to DCS, and she brought the child to Our Kids Center, the Nashville Children's Alliance, and to numerous individual practitioners, psychologists, psychiatrists and pediatricians, to all of whom she repeated the abuse allegations.

Some of those practitioners also reported the suspected abuse to DCS, pursuant to what they deemed to be their legal duty under *Tenn. Code Ann. § 37-1-403(a)(3)*. But none were able to confirm that any abuse had occurred, and some observed conduct by Mother and the child that led them to doubt that it had.[11] In the end, the only practitioner who expressed an unshakeable belief in Mother's theory of abuse was Dr. Strang.

The trial court enlisted Dr. Thomas to try to help the parents cooperate in parenting the child. He spent many hours observing the child and both parents, and speaking to the practitioners who had treated the child. If his observations had confirmed the likelihood of abuse, then such cooperation would not have been possible and probably not even desirable. Dr. Thomas observed among other things, that when he presented information to Mother that indicated that abuse had not occurred, Mother acted disappointed rather than relieved. In the end, Dr. Thomas concluded that the real impediment to parental cooperation was not abuse, but rather Mother's refusal to accept any evidence that the alleged abuse had not occurred, and her absolute determination to alienate the child from

[11] *Tenn. Code Ann. § 37-1-403(a)(3)* requires any person who has reason to believe that a child has been sexually abused to report that information "regardless of whether such person knows or believes that the child has sustained any apparent injury as a result of such abuse."

Father, regardless of the evidence.

The trial court found Dr. Thomas to be a credible witness. In light of Mother's irrational attachment to her belief about Father's guilt, the court concluded that she would never be willing to promote a healthy relationship between Jonathan and Father, and that it was in Jonathan's best interest that Father be named as his primary residential parent.

In Cone v. Cone, a case with facts remarkably similar to the present one, the trial court transferred the custody of a young child from the mother to the father. The mother argued on appeal that such a transfer was a violation of the PPRA. After performing an independent examination of the record, this court affirmed the trial court, explaining its decision in language which fits the facts of this case as aptly as it did the facts in Cone.

> The trial court found that Mother's allegations of sexual abuse by Father were untrue, and that Mother had become preoccupied with the notion that Father was abusing the Child and refused to let go of that obsession despite the lack of evidence to support it. Thus, the trial court's findings indicate that Mother did not meet the "good faith" and "reasonable belief" requirements of the PPRA. In addition, the trial court's best interest determination was not "based solely on that belief [that the child was the victim of abuse] or the reasonable actions taken based on that belief."

*Cone v. Cone, M2008-02303-COA-R3-CV, 2010 Tenn. App. LEXIS 310, 2010 WL 1730129 at *16 (Tenn. Ct. App., Apr. 29, 2010)*(rule 11 perm. app. denied, Nov. 15, 2010).

Similarly, in this case, the trial court's determination of the child's best interests and modification of the parenting arrangement were not based solely upon Mother's continued allegations. Thus, there was no violation of the PPRA.

Finally, Mother argues that the trial court changed the custody of the child in order to punish her. She notes that child custody decisions should not be used to reward or punish parents, but should be based on the best interests of the child. *See Massey-Holt v. Holt, 255 S.W.3d 603, 610-611 (Tenn. Ct. App. 2007)*; *Adelsperger v. Adelsperger, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997)*. We have made an independent examination of the record and we have found nothing to suggest that the court acted out of a punitive motive.

## IX. The Role of the Guardian ad Litem

After the trial court entered the final order in this case, Mother filed motions to recuse the trial judge and to remove the guardian ad litem, which were both denied. Mother argues on appeal that the trial court abused its discretion in its appointment of the guardian ad litem and/or in not removing the guardian ad litem pursuant to her motion, and she urges this court to vacate the court's final order because of the guardian ad litem's role in the creation of that order.

Guardians ad litem are charged with the duty of protecting the rights of minor children in a variety of situations. Mother's argument is based on the distinction between the powers of guardians ad litem appointed in two different types of cases. *Tenn. Code Ann. § 37-1-149* requires the trial court to appoint a guardian ad litem for a child "in any proceedings under this part resulting from a report of harm or an investigation report under *§§ 37-1-401 - 37-1-411*." The reference to "this part" in the above quotation apparently refers to Part 1 of Title 37 of the code, which includes actions brought as dependent and neglected, unruly, or delinquency proceedings. The cited statutes refer to mandatory child abuse reports.

*Tennessee Supreme Court Rule 40* sets out the powers of guardians ad litem appointed by the juvenile court in neglect, abuse and dependency proceedings. Guardians appointed under that rule have broad authority to perform any activities that

could be expected of an attorney participating in a trial, including petitioning the court on the child's behalf, participating in formal discovery, making opening statements and closing arguments, examining witnesses in court, filing briefs and legal memoranda, and preparing and submitting proposed findings of fact and conclusions of law. *Tenn. Sup. Ct. R. 40(d)*.

In contrast, *Tennessee Supreme Court Rule 40(a)* governs the powers of guardians ad litem appointed by any court in custody proceedings. Guardians appointed under *Rule 40(a)* have a more restricted role than guardians appointed under *Rule 40*. For example, they may not make opening and closing statements or examine witnesses in court. They also may not function as special masters to make adjudicative decisions.

The guardian ad litem took an active role in this case, including filing pleadings, making opening statements and closing arguments, questioning witnesses, and preparing orders for the court. Since the court ultimately found this case to be a custody proceeding, Mother argues on appeal that the guardian ad litem exceeded her authority, and that any court orders based on her improper input were therefore invalid.

We note that Mother's own petition alleged that Jonathan had been harmed and that DCS had initiated an investigation of alleged abuse. Thus, the court was required under the circumstances to appoint a *Rule 40* guardian ad litem, with the enhanced powers afforded by that rule for the protection of a possibly endangered child. Even as her allegations of abuse began to appear doubtful, Mother continued to report additional episodes of alleged abuse, so the need for a *Rule 40* guardian did not disappear.

Mother did not object to the guardian ad litem's role at any time during the course of the proceedings prior to the entry of the final order. It was only in her amended motion to stay the final order, filed on November 24, 2010 that Mother objected to the conduct of the guardian ad litem, and only during the hearing on that motion, on December 14, 2010, that she asserted that the guardian ad litem should have been appointed pursuant to *Rule 40(a)* rather than pursuant to *Rule 40*. The trial court rejected Mother's argument, noting that it initially treated the case as one for dependency and neglect, and that Mother did not ask for a change in the guardian ad litem's status when it became clear that custody was at issue. We agree with the trial court.

Mother also objects to what she deems to be improper ex parte communications with the trial court by the guardian ad litem. She focuses on the fact that the guardian ad litem drafted many of the orders in this case, including the final order, which was drafted in accordance with the judge's instructions, as conveyed to the guardian through e-mails. The court addressed these objections in its order of February 23, 2011 dismissing Mother's motion for the recusal of the trial judge and the removal of the guardian ad litem. The court noted that Canon 2, Supreme Court Rule 10, prohibits ex parte communications concerning a pending or impending proceeding, but also states that

> Where circumstances require, ex parte communications for scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits are authorized; provided: (i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication; and (ii) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond.

The court noted that the drafting of the court's orders is an administrative function, and that it was necessary to delegate the drafting of the final order in light of the numerous pleadings, motions, exhibits and hearings that generated the voluminous record in this case. The court also declared that it chose the guardian ad litem for the task as she was the most neutral participant in this contentious

matter. Further, the e-mails between the court and the guardian ad litem that Mother objected to conveyed necessary information for the drafting of the order; thus, they also served an administrative purpose. In short, Mother's argument is without merit.

## X. The Role of Dr. Thomas

The trial court initially appointed Dr. Thomas to act as a family counselor to help Mother and Father work together for the benefit of the child, if that was at all possible. The appointment became necessary partly because Dr. Strang refused to meet with Father for any purpose, and also because she had abdicated her therapeutic role in favor of an investigative one. After Dr. Thomas testified about his initial efforts to work with the parties, his role became the subject of two motions. Mother filed a motion to disqualify Dr. Thomas from any further participation in the proceedings and to strike his entire testimony from the record, while the guardian ad litem asked that he be recognized as an expert witness.

Mother's motion stated that her attorney had discovered that Dr. Thomas was associated with Dr. Brian Wind, a psychologist who had counseled Father through the Tennessee Colleague Assistance Foundation ("TCAF"), and that this association created a conflict of interest, or at least an appearance of impropriety. Dr. Thomas serves as the President of that organization, and Dr. Wind is the clinical director.

It is undisputed that Dr. Wind was Father's counselor, for Father testified to that when he submitted evidence of his compliance with the TCAF program during the hearing of April 21, 2010. Dr. Thomas was questioned about his relationship with Dr. Wind on September 13, 2010, before being allowed to testify on Mother's motion to stay Father's overnight visitation. Dr. Thomas testified that Dr. Wind's full-time job is with the Sleep Disorder Clinic in Murfreesboro, and that he only works part-time with TCAF. Dr. Thomas also testified that as President of TCAF, he is responsible for broad policy decisions, but not for the day-to-day operation of the foundation.

Dr. Thomas acknowledged that he shares office space with Dr. Wind, but testified that he does not supervise his work, does not pay him, and does not have any access to his computer files. He explained that he had disclosed his connection with TCAF to the trial judge and to the attorneys for both parties prior to his appointment, and that there was no objection to his participation in the case, not even from Mother's attorney at the time.[12]

Dr. Thomas also testified that he only learned that Father was a patient of Dr. Wind when Mother's psychiatrist asked him to contact Dr. Wind to verify Father's compliance with the requirements of his substance abuse program. The brief exchange resulting from that request was Dr. Thomas' only contact with Dr. Wind for the purposes of this case. After extended questioning of Dr. Thomas by the attorneys for both parties and by the guardian ad litem, the trial court ruled that there was no conflict of interest, and it dismissed Mother's motion to disqualify him.

Mother brings up Dr. Wind's role once again on appeal, and argues that because of it, the trial court erred in failing to disqualify Dr. Thomas from any further participation in the case. But Dr. Thomas was fully cross-examined about the conflict of interest that Mother alleged, and his testimony demonstrated that his professional relationship with Dr. Wind was not a close one and that there was no exchange of confidential information related to Dr. Wind's treatment of Father. We also note that during the initial discussions about appointing a neutral therapist in this case, the court observed that in the relatively small professional world of psychologists and psychiatrists in Nashville, it would be difficult to find capable practitioners who would not have connections of one kind or another

[12] The record shows that Mother has employed and discharged at least seven different attorneys during the course of these proceedings.

with each other. The trial court did not err in denying Mother's motion.

After denying Mother' motion, the trial court granted the guardian ad litem's motion to recognize Dr. Thomas as an expert. Mother argues that the trial court's designation of Dr. Thomas as an expert witness was improper because the court did not comply with the formal requirements for the appointment of an expert. Under *Tennessee Rule of Evidence 706*, "a witness so appointed shall be informed of the witness' duties in writing, a copy of which shall be filed with the clerk, or at a conference at which the parties shall have opportunity to participate."

Although the rule does not so specify, it appears that it was designed especially for pre-trial discovery, where parties exchange lists of the witnesses they propose to call at trial, and are able to raise questions about the scope of testimony of experts who have no direct connection to the parties or to the claims at issue. But when the guardian ad litem moved the court to recognize Dr. Thomas as an expert, he had already appeared before the court and had presented extensive testimony as a fact witness. Mother did not object to the motion, and she does not explain how she was prejudiced by the failure to file the document described in *Rule 706*.

Expert witnesses are allowed to testify as to their opinions, based upon their special skills or on scientific knowledge which is not generally within the knowledge or understanding of laypersons. *Kirksey v. Overton Pub, Inc., 804 S.W.2d 68, 74-75 (Tenn. Ct. App. 1990)*. By designating Dr. Murphy as an expert, the court was able to receive the full benefit of his expertise as well as of his specific knowledge of the parties. Mother does not deny that Dr. Thomas was highly qualified to offer his opinions as an expert witness on child psychology. It is apparent to us that Mother's objections to the role of Dr. Thomas have nothing to do with his qualifications or any alleged conflict of interest, but simply arise from her disagreement with the content of his testimony.

In any case, questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are generally left to the discretion of the trial court. *McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 263 (Tenn. 1997)*; *State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993)*; *Murray v. State, 214 Tenn. 51, 377 S.W.2d 918, 920 (Tenn. 1964)*; *State v. Holcomb, 643 S.W.2d 336, 341 (Tenn. Crim. App. 1982)*. The trial court in this case did not abuse its discretion in recognizing Dr. Thomas as an expert witness.

## XI. Attorney Fees, Expert Fees and Guardian ad Litem Fees

In its final order of November 12, 2010, the trial court addressed competing motions by the parties related to payment of the fees incurred in this case. The court found that "the litigation at hand has been prolonged by the Mother at great expense to the parties." The court also found that Mother had a greater financial ability than Father to pay the costs incurred,[13] that Father was the prevailing party, and that the fee affidavits submitted by Father's attorney, the guardian ad litem and Dr. Thomas were reasonable and necessary.

The court accordingly ordered Mother to pay Father's attorney fees, which amounted to $20,070.50. The court also awarded Dr. Thomas a judgment in the amount of $24,251.43, with Mother to pay $17,296.26 towards that judgment and Father to pay $6,955.17. The guardian ad litem was awarded $22,170, with Mother to pay $15,740.70, and Father to pay $6,429.30.[14] Mother argues on appeal that the awards were unjustified and an abuse of the trial court's discretion.

---

[13] The proof showed that Mother's income was almost twice as large as Father's.

[14] In its final order, the trial court explained that it analyzed the fee affidavits of the guardian ad litem and of Dr. Thomas, and concluded that 71% of the time each of them spent on the case was a direct result of Mother's requests and/or actions. The court's allocation of responsibility between the parties for payment of those fees is based on that analysis.

We note at the outset that there is specific statutory authorization for the award of attorney fees to the prevailing party in cases involving the custody of children. See *Tenn. Code Ann. § 36-5-103(c)*. In addition, *Tenn. R. Civ. P. 17.03* authorizes the trial court to award a reasonable fee for the services of a guardian ad litem, "to be taxed as costs." *Tenn. R. Civ. P. 54.04(2)* specifically includes both guardian ad litem fees and reasonable and necessary expert witness fees in the class of allowable discretionary costs that the court may apportion between the parties "as the equities demand." *Perdue v. Green Branch Mining Co., 837 S.W.2d 56, 60 (Tenn. 1992)*.[15]

We agree with the trial court's conclusion that many of Mother's motions were frivolous and filed for no legitimate legal purpose. Among them were her untimely motions for the recusal of the trial judge and for the removal of the guardian ad litem. Further, the award or allocation of attorney fees and discretionary costs is deemed to be within the sound discretion of the trial court. Absent an abuse of discretion, reviewing courts will not interfere with a trial court's ruling regarding any of these awards.

This court has applied the abuse of discretion standard to fee awards in numerous cases. *See* *Smith v. Smith, 984 S.W.2d 606, 610 (Tenn. Ct. App.1997)* (citing *Storey v. Storey, 835 S.W.2d 593, 597 (Tenn. Ct. App. 1992)*) (attorney fees); *Sherrod v. Wix, 849 S.W.2d 780 (Tenn. Ct. App. 1992)* (attorney fees). *Keisling v. Keisling, 196 S.W.3d at 726* (citing *Kahn v. Kahn, No. W2003-02611-COA-R3-CV, 2005 Tenn. App. LEXIS 333, 2005 WL 1356449, at *2 (Tenn. Ct. App. June 6, 2005)*) (no Tenn. R. App. P. 11 application filed) (guardian ad litem fees); *Salisbury v. Salisbury, 657 S.W.2d 761, 770 (Tenn. Ct. App. 1983)* (guardian ad litem fees); *Stalsworth v. Grummons, 36 S.W.3d 832, 836 (Tenn. Ct. App. 2000)* (expert witness fees); *Massachusetts Mutual Life Ins. Co. v. Jefferson, 104 S.W.3d 13, 35 (Tenn. Ct. App. 2002)*(*Rule 54.04(2)* discretionary costs in general).

Mother acknowledges the discretion possessed by the trial court in awarding or allocating those fees and costs, but she complains that she was deprived of the opportunity to contest their reasonableness, because they were filed under seal. For his part, Father cites the case of *Kahn v. Kahn, 756 S.W.2d 685, 696 (Tenn. 1988)* for the proposition that the court is not required to hear proof as to the reasonableness of a fee award unless the party disputing its reasonableness asks for a hearing.

During the hearing of September 14, 2010 in the present case, Mother's attorney requested that the sealed fee affidavits be opened for her inspection. They were duly opened and on December 22, 2010 she filed a motion for a hearing on the reasonableness of the fees. Her motion set out in some detail those parts of the fee affidavits that she objected to. However, she failed to schedule the hearing or otherwise notify the court of her intention to proceed on the hearing she requested. Because the trial court did not conduct a hearing on the matter, there is no basis for this court to rule on the reasonableness of the attorney fees awarded.

Finally, Father asks for an award of attorney fees on appeal. Such fees may be awarded under the authority of *Tenn. Code Ann. § 36-5-103(c)*. *Smith v. Smith, 984 S.W.2d 606, 610 (Tenn. Ct. App. 1997)*. The decision to award attorney fees incurred on appeal lies solely within the discretion of the appellate court. *Andrews v. Andrews, 344 S.W.3d*

[15] An additional potential source of authorization for the award of legal costs incurred in cases like the present one is found in a recently enacted statute:

Whenever a trial court finds that any person knowingly made a false allegation of sexual abuse in furtherance of litigation, in addition to any other penalties provided for by law or rule, the court may hold the accuser in contempt of court and may order the accuser to pay all litigation expenses, including, but not limited to, reasonable attorney's fees, discretionary costs and other costs incurred by the wrongly accused party in defending against the false allegation.

*Tenn. Code Ann. § 36-6-114*, which became effective July 1, 2010. Because we think the other sources provide the authority needed, we need not determine whether Mother's allegations meet the requirements of the statute.

*321, 340 (Tenn. Ct. App. 2010)*. We believe that such a fee is justified in this case, and we remand this case to the trial court for a determination of the reasonable and necessary attorney fees Father incurred on appeal.

## XII. Conclusion

The judgment of the trial court is affirmed. We remand this case to the Juvenile Court of Davidson County for a determination of the reasonable and necessary attorney fees Father incurred on appeal and an award of that amount, as well as for any further proceedings necessary. Tax the costs on appeal to the appellant, Dr. Ok Yung Chung.

PATRICIA J. COTTRELL, JUDGE

---

End of Document